# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ELIZABETH NUNEZ,

    Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

    Defendant.

Case No. 1:16-cv-00294-SKO

ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT

(Doc. 1)

## I. INTRODUCTION

Plaintiff Elizabeth Nunez ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") benefits pursuant to Title II of the Social Security Act. 42 U.S.C. § 405(g). The matter is currently before the Court on the parties' briefs, which were

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017). She is therefore substituted as the defendant in this action. *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

## II. FACTUAL BACKGROUND

Plaintiff was found disabled as of October 25, 2001, in a decision dated September 8, 2006. (Administrative Record ("AR") 14, 110–13.) On March 22, 2011, it was determined Plaintiff was no longer disabled as of March 1, 2011. (AR 14, 121–24.) On April 5, 2011, Plaintiff requested reconsideration, alleging she remained disabled because she "still can't walk after sitting for more than 10 minutes," and her "hands still go numb." (AR 125.) After a disability hearing, the State agency Disability Hearing officer upheld the decision. (AR 127–37.)

Plaintiff was born on September 20, 1965, and has a high school education. (AR 102, 110.) Before being found disabled, Plaintiff worked in the medical field for 17 years, most recently as a receptionist. (AR 21, 67–72, 74.) Plaintiff was found disabled as of October 2001 due to the medically determinable impairments of bilateral knee derangement and bilateral carpal tunnel syndrome, which limited her to lifting 10 pounds occasionally or frequently, standing and/or walking 2 hours in an 8-hour workday, sitting 6 hours in an 8-hour workday, and no repetitive fine or gross manipulation. (AR 16, 17, 111.)

### A. Relevant Medical Background

On June 4, 2010, Plaintiff was seen by Lenita R. Williamson, M.D. complaining of hand and left knee pain. (AR 411.) Dr. Williamson noted Plaintiff had a positive Phalen's sign and a negative Tinel's sign. (AR 411.) Dr. Williamson saw Plaintiff again on November 5, 2010, for pain in her left knee due to having slipped on water 4 days prior. (AR 410.) Dr. Williamson found 0–110 degree range of motion Plaintiff's left knee with no ACL rupture, and noted that Plaintiff had made some progress since 2006. (AR 410.)

On November 16, 2010, consultative examining physician Dale Van Kirk, M.D., conducted a comprehensive orthopedic evaluation of Plaintiff at the request of the State agency. (AR 414–17.) Plaintiff complained of pain in her left knee that increases when she squats down,

---

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 8, 9.)

2

tries to run, crouches, or kneels. (AR 414.) Dr. Van Kirk noted Plaintiff's history of four knee surgeries, culminating with an anterior cruciate ligament reconstruction in 2006. (AR 414.) Plaintiff reported using a knee brace "frequently" when she is "out and about, for even and uneven terrain," although she was not wearing the brace at the examination. (AR 415.) Dr. Van Kirk observed that Plaintiff sat comfortably in a chair, got up and moved around the examination room, and could get on and off the examination table without difficulty. (AR 415.) Plaintiff's Romberg test was normal, her tandem talking with one foot in front of the other was satisfactory, and she could get up on her toes and heels. (AR 415.)

Dr. Van Kirk found that Plaintiff had full range of motion without pain or difficulty in her right knee, and had 10–110 degrees range of motion in her left knee. (AR 416.) He observed 2+ patellofemoral and 1+ femoral tibial crepitation, and slight varus/valgus laxity in Plaintiff's left knee. (AR 416.) In her wrist joints, Plaintiff's extension and flexion were 0–60 degrees, her radial deviation was 0–20 degrees, and her ulnar deviation was 0–30 degrees bilaterally. (AR 416.) With respect to Plaintiff's finger and thumb joints, Dr. Van Kirk found that Plaintiff's flexion/extension of the proximal phalanx was 70 degrees and the distal phalanx was 90 degrees bilaterally. (AR 416.) Her motor strength in both upper and lower extremities were was normal. (AR 417.)

Dr. Van Kirk's impression was that Plaintiff had "residual pain and restriction of motion" following her four arthroscopic procedures on the left knee, culminating with left anterior cruciate ligament reconstruction. (AR 417.) Dr. Van Kirk concluded that Plaintiff's was limited to (1) standing or walking 6 cumulative hours out of an 8-hour day; (2) lifting and carrying 25 pounds frequently and 50 pounds occasionally; (3) occasional postural activities, including bending, stooping, crouching, climbing, kneeling, balancing, crawling, pushing, or pulling; and (4) avoiding working in a cold and/or damp environment. (AR 417.) Dr. Van Kirk found no limitations on sitting or manipulative activity. (AR 417.)

On January 10, 2011, medical consultant J. Hartman, M.D., completed a form "Physical Residual Functional Capacity Assessment." (AR 419–23.) Dr. Hartman opined that Plaintiff could (1) lift and/or carry 25 pounds frequently and 50 pounds occasionally; (2) stand, walk,

and/or sit for about 6 hours in an 8-hour workday; (3) occasionally push and/or pull with her left lower extremities, climb ramps or stairs, balance, stoop, kneel, crouch, and crawl; and (4) not climb ladders, ropes, or scaffolds. (AR 420–21.)

On April 8, 2011, Plaintiff saw Dr. Williamson complaining of ongoing lateral elbow pain and posterior elbow pain, and bilateral hand numbness that would wake her up at night. (AR 431.) An examination of Plaintiff's right elbow revealed that she had 0–140 degrees of flexion, full pronation and supination, with no bony crepitus or deformity. (AR 431.) Plaintiff had pain with resistance of her wrist and long finger, centered over her lateral epicondyle and radiating down her forearm. (AR 431.) She had negative Tinel's and Phalen's signs. (AR 431.) An X-ray revealed a small spur in the olecranon tip of her elbow. (AR 431.) Dr. Williamson diagnosed Plaintiff with right tennis elbow and "early carpal tunnel syndrome," and injected her right lateral elbow with lidocaine and Depo-Medrol. (AR 431.) Plaintiff was provided a tennis elbow splint and a prescription for anti-inflammatories and pain pills. (AR 431.) Dr. Williamson also recommended over-the-counter night supports. (AR 431.)

Plaintiff had an evaluation for a mass in her left breast with Ronald G. Weakley, M.D., on May 23, 2011. (AR 438.) She stated that she volunteers at her son's school and is "up on her feet, which she thinks aggravate[s] the knee issues." (AR 438.) Plaintiff reported taking Tylenol with Codeine #3 as needed for knee problems. (AR 438.)

On September 2, 2011, medical consultant L. Kiger, M.D., completed a form "Physical Residual Functional Capacity Assessment." (AR 480–84.) Like Dr. Hartman, Dr. Kiger opined that Plaintiff could (1) lift and/or carry 25 pounds frequently and 50 pounds occasionally; (2) stand, walk, and/or sit for about 6 hours in an 8-hour workday; (3) occasionally push and/or pull with her left lower extremities, climb ramps or stairs, kneel, crouch, and crawl; and (4) not climb ladders, ropes, or scaffolds. (AR 481–82.) Dr. Kiger noted Plaintiff's postural limitations were due to "knee pain." (AR 482.)

**B.      Plaintiff's Self-Reports and Interview**

Plaintiff reported numbness in her fingers and problems with her right arm and shoulders as a result of fall beginning in August 2010. (AR 251.) She stated: "I have difficulty writing as

4

my right hand gets achy and my [sic] both of my arms irritated. I still can't walk after sitting for more than 10 minutes. My hands still go numb." (AR 253.) Plaintiff also claimed that "the doctor she saw in Merced xrayed the wrong leg." (AR 254.)

On November 30, 2010, Plaintiff completed a "Pain Questionnaire," in which she complained of "aching, throbbing" left knee pain that began in 1998. (AR 232.) According to Plaintiff, the pain occurs when she sits or stands too long or "bang[s] her knee." (AR 232.) In response to the question "What brings the pain on (Please be very specific)?," Plaintiff responded "while walking, while standing if I move a wrong direction it can set it off." (AR 232.) She stated that the pain lasts "sometimes all day, half day, night," and that elevating her knee and applying ice packs help. (AR 232, 233.) Plaintiff also stated she takes Aleve 3 times a day or more if needed, but that the medication does not relieve the pain. (AR 232.) She said she "does not need to be drug out," because when "my knee goes out I need to be of sound mind." (AR 233.) Plaintiff uses a knee brace to "feel more comfortable while walking or standing around the house" when she is in pain. (AR 233.)

Plaintiff described her "usual daily activities" as follows: "Can only shop limited time, sometimes the cold isles [sic] in the store will set off the pain more and cause it to give out." (AR 233.) According to Plaintiff, she has to stop an activity at least twice a day and ice her left knee. (AR 234.) Plaintiff stated that she used to play softball, cook a lot, and walk more before the pain. (AR 233.) Plaintiff stated that she can walk 2 blocks outside her home, that she can stand 30 minutes and sit 1 hour at a time, that a friend drives her to perform errands, that she is able to do light housekeeping chores (*i.e.*, dusting, cooking, etc.) without assistance, and that she needs assistance mopping, sweeping, and doing laundry. (AR 234.)

Plaintiff also completed an "Exertion Questionnaire" on November 30, 2010. (AR 235–37.) Plaintiff stated she lives in a house with family. (AR 235.) She described her symptoms as "I wake up my knee is in pain till the time I go to sleep, at times it can give out on me and cause me to fall." (AR 235.) When asked what kinds of things she does on an average day and how those activities make her feel, Plaintiff responded that she tries to keep her house clean when not in too much pain. (AR 235.) She stated that she can walk "2 blocks or farther" until my knee

starts to feel like it is going to give out, but "from the minute I get out of bed there's pain." (AR 235.) Plaintiff reported she does not climb stairs, that the kind of things she can lift "[d]epends when needed," and cannot carry things far and not often. (AR 236.) Plaintiff shops for groceries with her husband, cleans her home (doing dishes for 1 hour), drives a car with an automatic transmission for 30 minutes at a time, but does not work on cars or perform yard work. (AR 236.) She reported that she can no longer sweep and mop floors or bend down, and that she experiences pain in her knee when standing to do dishes. (AR 237.) Plaintiff sleeps for 3–4 hours at night with no rest period or naps needed during the day. (AR 237.) She takes Aleve for her knee pain and uses a knee brace when standing or walking. (AR 237.) Plaintiff states that she "can't depend" on her knee when standing or sitting for a long period of time. (AR 237.)

On April 5, 2011, Plaintiff was interviewed by a representative of the Social Security Administration. (AR 247–48.) The interviewer observed that Plaintiff appeared "nervous," but had no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking, seeing, using her hands, or writing. (AR 248.)

In April 2012, Plaintiff complained of worsening sciatic pain as the result of a fall in August 2011, a bone spur, and right elbow pain. (AR 259.) Plaintiff claimed that she could not take a shower every day because her hands "get really bad" and that her knee, arms, shoulder, and elbows are sensitive to weather conditions such that she cannot comb her hair. (AR 261.)

**C.  Administrative Proceedings**

On March 22, 2012, Plaintiff filed a timely written request for a hearing before an Administrative Law Judge ("ALJ") to dispute the determination. (AR 147.) On November 8, 2013, Plaintiff appeared without counsel and testified before an ALJ. (AR 56–81, 89–95.) Plaintiff's husband also testified at the hearing. (AR 81–89.)

   **1.  Plaintiff's Testimony**

Plaintiff testified that for the past two years she had been receiving treatment from Dr. Wesley Kinzie for her carpal tunnel syndrome and knee pain, and that he was her primary source of her treatment. (AR 59–60.) Specifically, Plaintiff testified that Dr. Kinzie "did my carpal tunnel in my hand" and recommended a knee replacement. (AR 59–60.) The ALJ noted that he

1 did not have any medical records from Dr. Kinzie, and instructed Plaintiff to provide his business card "to the reception window and have them make a copy" so that the ALJ could "get all the records from [Dr. Kinzie]." (AR 60.) The ALJ continued: "That's what we're going to do. We are going to get all of those records. Once we do, then, I'm going to assume that this record is complete." (AR 61.)

Plaintiff testified that having worked in the medical field for 17 years, she's "seen medications brought out" and she's seen them "kill people." (AR 62.) Plaintiff stated she was "tired of being cut" and tired of medications, and that Dr. Kinzie "doesn't believe in" pain medications and instead provided Motrin. (AR 62.) She testified that she had 3 orthoscopic surgeries and 1 ACL surgery on her left knee. (AR 63–64.)

Plaintiff stated that she could only kneel on her left knee for "about a second." (AR 64.) She testified that she can sometimes walk on her left knee and sometimes it will "give out" on her. (AR 76.) Plaintiff stated that temperatures effect the "aching feeling" in her left knee. (AR 76–77.) She testified that she can stand up for at least 30 minutes before her left knee "gives out" and she falls. (AR 77.) Plaintiff reported going to the doctor "a couple times" after falling, but that "all [she] can get is cortisone shots," but "only every three months." (AR 77–78.) When Plaintiff's left knee "gives out," she elevates and puts ice on it. (AR 78.)

Plaintiff testified that, assuming her knee was not going to give out, she could stand an hour at the most. (AR 79.) She can walk a half a mile without stopping, and can sit an hour and a half at the most without getting up to walk around. (AR 80.) Plaintiff stated that she can carry a gallon of liquid with her right hand. (AR 80–81.) Plaintiff testified that she was not presently experiencing pain in her left knee at the hearing but that it was getting numb and she had it elevated on a chair. (AR 86.) She stated that if she has to write something or hold something, her hands start hurting. (AR 89–90.) When asked whether she could do something not quite "as active" as her prior work as she performed it, Plaintiff responded "[m]ore or less, I think I could." (AR 91.) Plaintiff testified she also has an urination problem and is in the restroom every 5 to 10 minutes. (AR 93.)

//

### 2. **Vocational Expert Testimony**

A Vocational Expert ("VE") testified at the hearing that Plaintiff had past work as a receptionist—doctor's office, Dictionary of Operational Titles (DOT) code 237.367-038, which was sedentary work, with a specific vocational preparation (SVP)[3] of 4. (AR 95.) In a first hypothetical, the ALJ asked the VE to consider an individual who is limited to medium work with the requirement that they wear a pull-on left knee sleeve and is limited to occasional bending, stooping, crouching, climbing, kneeling, and pushing and pulling with the bilateral upper extremities. (AR 96.) The VE was also to assume this person should avoid concentrated exposure to temperature extremes and dampness, which would aggravate her left knee pain. (AR 96.) The VE testified that such a person could perform Plaintiff's past work. (AR 96.)

The ALJ asked a follow up question regarding the first hypothetical worker who was 40 years old with a high school education who was also unable to complete work or would be absent from work for up to three days per month for four months out of the year, or 12 days out of the year. (AR 97–98.) The VE testified that this individual could perform Plaintiff's past work, and that there would be other jobs in the national economy that Plaintiff could perform. (AR 98.)

The ALJ then proposed a third hypothetical, assuming the individual was limited to performing at the sedentary level with no climbing of ladders, ropes, or scaffolding, and no kneeling with the left knee, with all other postural activities (stooping, crouching, crawling, and kneeling with the right knee limited to occasionally. (AR 98–99.) The VE testified that such a person could perform Plaintiff's past work. (AR 99.)

The ALJ concluded the hearing by stating:

> All right. This is what's going to happen now: I'm going to get the updated medical records, as I said I would, and when all of the evidence is in — I may send you out to one of our doctors. I'm not promising that I will, but I'm saying I'll think about that, okay? I need to make a note to myself. At some point, this record is going to be complete. Once all the evidence is in, once I've gotten the new evidence that I've gotten from your treating sources, and

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

if I send you out for another doctor of our — you know, pay the cost on that. Once the evidence is in, I'm going to consider the evidence along with your testimony and your husband's testimony. I'm going to put it all together — and the testimony of the vocational experts, and I'm going to put it all together. I'm going to try to make the best decision I can. At some point, I will make a decision. It will be in writing, and I will mail it to you.

(AR 99–100.)

### D. The ALJ's Decision

On February 14, 2014, the ALJ issued a written decision and determined that Plaintiff's comparison point decision ("CPD") was dated September 8, 2006. (AR 15.) The ALJ concluded that Plaintiff had the severe impairments of a history of four left knee surgeries with residual pain and reduced range of motion, right tennis elbow, early carpal tunnel syndrome, and a history of left breast surgical excision of a large mass. (AR 16.) The ALJ determined that these impairments did not meet or equal a listed impairment. (AR 16.) The ALJ found that medical improvement had occurred as of March 1, 2011, because there had been a decrease in medical severity of the impairments present at the time of the CPD. (AR 16–17.)

The ALJ found Plaintiff retained the residual functional capacity ("RFC")[4] to

> . . . perform a wide range of sedentary work as defined in 20 CFR 404.1567(a): she cannot kneel on the left knee or climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel on the right knee, crouch, and crawl.

(AR 17.)

Given her RFC, the ALJ determined that Plaintiff was not disabled because she was able to perform her past relevant work as a receptionist—doctor's office (DOT 237.367-038, sedentary, and SVP 4). (AR 21–22.) The ALJ therefore concluded that Plaintiff's disability had ended as of March 1, 2011, and that Plaintiff had not become disabled again since that date. (AR 22.) In

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 20, 21.)

The Appeals Council denied Plaintiff's request for review on January 29, 2016, making the ALJ's decision the Commissioner's final determination for purposes of judicial review. (AR 1–2.)

**E.     Plaintiff's Complaint**

On March 2, 2016, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. (Doc. 1.) Plaintiff contends that the ALJ erred in finding Plaintiff's physical impairments had medically improved and that she was no longer disabled as of March 1, 2011. (Doc. 15.)

### III.     SCOPE OF REVIEW

The Court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

### IV.     APPLICABLE LAW

Social security claimants have the initial burden of proving disability. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5. "Once a claimant has been found to be disabled, however, a presumption of continuing disability arises in her favor." *Bellamy v. Sec'y of Health & Human Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985) (citing *Murray v. Heckler*, 722 F.2d 499, 500 (9th Cir. 1983)). Balancing this presumption of continued disability however, are provisions of the Act and its implementing regulations that are designed "to encourage individuals who have previously

suffered from a disability to return to substantial gainful employment when their medical condition improves sufficiently to allow them to do so." *Flaten v. Sec'y. of Health & Human Servs.*, 44 F.3d 1453, 1458 (9th Cir. 1995). Accordingly, a claimant who has been awarded disability benefits is required to undergo periodic disability reviews, "to determine whether a period of disability has ended." *Id.* at 1460*; Schweiker v. Chilicky*, 487 U.S. 412, 415 (1988) (most disability determinations must be reviewed at least once every three years); *see* 42 U.S.C. § 421(i)(1) (cases must be reviewed for continuing eligibility "at least once every three years"); 20 C.F.R. § 404.1594 (rule governing termination of benefits).

Once a claimant is found to be disabled, cessation of disability may only be assessed following an eight-step sequential evaluation process. 20 C.F.R. § 404.1594(f). During step three, which is of particular importance to the instant dispute, the Commissioner determines whether the claimant has experienced "medical improvement." 20 C.F.R. § 404.1594(f)(3). Medical improvement is defined as "any decrease in the medical severity" of a recipient's impairment, 20 C.F.R. § 404.1594(b)(1), and requires a "comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)," *id.* § 404.1594(c)(1). The Commissioner bears the burden of proving "medical improvement." *Bellamy*, 755 F.2d at 1381; *see also Murray*, 722 F.2d at 500 (finding the Secretary had the burden to come forward with substantial evidence of improvement). The Commissioner's regulations prescribe a specific baseline for this comparison: an ALJ must "compare the . . . medical severity" of the impairment(s) "present at the time of the most recent favorable medical decision"—that is, when the claimant was last found disabled or continued to be disabled—"to the medical severity of that impairment(s)" at the time of the comparison. *Id.* § 404.1594(b)(7). *See Attmore v. Colvin*, 827 F.3d 872, 875–76 (9th Cir. 2016).

### IV. DISCUSSION

In her Opening Brief (Doc. 15), Plaintiff contends that the ALJ, who affirmed the decision to terminate benefits effective March 1, 2011, based on a finding of medical improvement, erred in three respects. First, Plaintiff contends that the ALJ failed to adequately develop the record by obtaining a consultative examination "that focused on Plaintiff's hands and electrodiagnostic

testing" and by obtaining records from treating physician Dr. Kinzie. (*Id.* at 7.) Second, and related in part to her first argument, Plaintiff argues that the record lacks substantial evidence supporting the ALJ's finding that Plaintiff experienced medical improvement. (*Id.* at 6.) Third, Plaintiff argues that the ALJ erred by finding Plaintiff's allegations regarding the intensity, persistence, and limiting effects of her pain were not fully credible. (*Id.* at 7–11.)

The Commissioner filed an Answering Brief (Doc. 16), in which she asserts that substantial evidence supports the ALJ's finding that Plaintiff experienced medical improvement and that her disability ceased as of March 1, 2011. (*Id.* at 4–6.) The Commissioner contends further that there was no need to develop the record because Dr. Kinzie's records "do not appear material to the period at issue" and, even if so, the ALJ met his duty because Plaintiff failed to submit them. (*Id.* at 4–6.) Finally, the Commissioner maintains further that the ALJ properly evaluated Plaintiff's credibility. (*Id.* at 7–11.)

**A.      The ALJ Failed to Fully and Fairly Develop the Record.**

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure that the claimant's interests are considered . . . . even when the claimant is represented by counsel.'" *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (citing *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). When, as here, the claimant is unrepresented, "the ALJ must be especially diligent in exploring for all the relevant facts." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). *See also Celaya*, 332 F.3d at 1183 (When a claimant is not represented by counsel, the duty to develop the record is "heightened."); *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th Cir. 1992) ("[T]he ALJ is not a mere umpire at such a proceeding, but has an independent duty to fully develop the record, especially where the claimant is not represented: . . . it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. He must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited.").

It is well established that a claimant bears the burden of providing medical and other evidence that support the existence of a medically determinable impairment. *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998) ("At all times, the

burden is on the claimant to establish her entitlement to disability insurance benefits."). Indeed, it is "not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so." *Bowen*, 482 U.S. at 146 n.5.

Nevertheless, as the Ninth Circuit Court of Appeals has also explained:

> The ALJ in a social security case has an independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered. This duty extends to the represented as well as to the unrepresented claimant. When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts . . . . Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry.

*Tonapetyan*, 242 F.3d at 1150 (citations and quotation marks omitted). In short, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citing *Tonapetyan*, 242 F.3d at 1150).

"The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Tonapetyan*, 242 F.3d at 1150. However, "as some courts have persuasively observed, the ALJ 'does not have to exhaust every possible line of inquiry in an attempt to pursue every potential line of questioning. The standard is one of reasonable good judgment.'" *Stevenson v. Colvin*, No. 2:15-cv-0463-CKD, 2015 WL 6502198, at *3 (E.D. Cal. Oct. 27, 2015) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)).

Here, the record upon which the ALJ's determination of medical improvement was based was inadequate for the ALJ to properly evaluate the medical evidence and arrive at a conclusion that was supported by substantial evidence. The ALJ found that, as of March 1, 2011, Plaintiff had experienced "medical improvement," such that "the impairment present at the time of the CPD had decreased in medical severity to the point where [Plaintiff] had no manipulative limitations." (AR 16–17.) The ALJ stated further that Plaintiff "does not allege hand pain and has normal range of motion and grip strength in the hands." (AR 17.) The record, however, belies

these findings. As the ALJ noted (AR 21), treating physician Dr. Williamson diagnosed Plaintiff with early carpal tunnel syndrome in April 2011. (AR 431) Upon examination, Plaintiff had pain with resistance of her wrist and long finger, centered over her lateral epicondyle and radiating down her forearm. (AR 431.) The ALJ further noted (AR 18), contrary to his earlier statement, that Plaintiff did allege pain and numbness in her fingers, beginning in August 2010. (AR 251.) Plaintiff stated: "I have difficulty writing as my right hand gets achy and my [sic] both of my arms irritated . . . . My hands still go numb." (AR 253.) Plaintiff also testified that if she has to write something or hold something, her hands would start hurting. (AR 89–90.)

At the hearing, Plaintiff also testified that she had been receiving treatment from Dr. Kinzie since 2012 for her carpal tunnel syndrome and that he was her primary source of her treatment. (AR 59–60.) The ALJ noted that Dr. Kinzie was not included on Plaintiff's list of treating sources from whom records were produced. (AR 59.) It is undisputed that Dr. Kinzie's records were never provided to the Commissioner. The Commissioner suggests that the blame for the absence of Dr. Kinzie's records lies with Plaintiff, having had multiple opportunities to submit them. (*See* Doc. 16 at 6–7.) But at the hearing the ALJ promised, repeatedly, that he would "get all the records" from Dr. Kinzie and that he would leave the record open until he did so. (AR 60. *See also* AR 61 ("That's what we're going to do. We are going to get all of those records. Once we do, then, I'm going to assume that this record is complete."); AR 99–100 ("I'm going to get the updated medical records, as I said I would . . . . At some point, this record is going to be complete. Once all the evidence is in, once I've gotten the new evidence that I've gotten from your treating sources . . . .").) It is reasonable that Plaintiff would rely on the ALJ's repeated promises to procure the records, particularly given the ALJ's duty to "assure that [Plaintiff's] interests are considered" and to be "especially diligent in exploring for all the relevant facts" where, as here, Plaintiff is unrepresented. *Cf. Casas v. Comm'r of Soc. Sec. Admin.*, No. CV-16-08082-PCT-JAT, 2017 WL 2222613, at *15 (D. Ariz. May 22, 2017) (rejecting the plaintiff's argument that the ALJ violated the plaintiff's due process rights by promising, and failing, to obtain the plaintiff's records because the ALJ merely promised that she would "try and order" the updated records, the plaintiff did not argue that the ALJ did not try to order the records, and the plaintiff did not appear

1  to rely on any such "promise," as she stated she would obtain the records herself).

2  The Commissioner asserts that because Dr. Kinzie's treatment of Plaintiff did not begin until June 2012 (AR 266), his records "are not material to the question of Plaintiff's [RFC] on or before March 2011," and therefore the ALJ's duty to develop the record was never triggered in the first instance.[5] (Doc. 16 at 7.) That argument is without merit. Although Plaintiff's cessation date of March 1, 2011, is the relevant date in this case, the Ninth Circuit has held that medical evidence from after the cessation date is relevant to whether Plaintiff experienced medical improvement as of her cessation date. *See McNabb v. Barnhart*, 340 F.3d 943, 945 (9th Cir. 2003) (remanding to the district court to consider all of the evidence before the ALJ, including "post-cessation date" evidence, because it "may well be relevant to determine [the claimant's] condition as of the cessation date."). Moreover, clearly the ALJ deemed the medical record at the time of the hearing "inadequate to allow for proper evaluation of the evidence"—thus triggering his duty to develop the record, *see Tonapetyan*, 242 F.3d at 1150—otherwise he would not have committed to obtaining records from Dr. Kinzie. (*See* AR 60–61, 99–100.)

Given the dearth of medical evidence in the record indicating the degree to which Plaintiff's bilateral carpal tunnel syndrome that was present at the time of the CPD had medically improved, the ALJ had a duty to further develop the record. However, he did not fulfill that duty. Despite his promises, the ALJ did not, as set forth above, obtain the records of Dr. Kinzie, who was treating Plaintiff for carpal tunnel syndrome and who had apparently performed a procedure on one of Plaintiff's hands. (*See* AR 60.) Accordingly, the ALJ committed prejudicial error that invalidated his findings of medical improvement and Plaintiff's RFC based on those findings. *See Hoth v. Colvin*, No. 2:13–cv–2224 CKD, 2014 WL 6610897, at *6 (E.D. Cal. Nov. 19, 2014); *Brown v. Astrue*, No. CIV S-06-2129 KJM, 2008 WL 850203, at *2 (E.D. Cal. Mar. 28, 2008).

**B.  The ALJ's Error Warrants Remand for Further Proceedings.**

When the Court finds that the ALJ committed prejudicial error, it possesses the discretion to remand or reverse and award benefits. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir.

---

[5] The Commissioner's argument is inconsistent in this regard. Elsewhere in her Answering Brief, she contends that the ALJ *fulfilled* his duty to develop the record. (*See* Doc. 16 at 5.)

1989). Generally, if the Court finds that the ALJ's decision was erroneous or not supported by substantial evidence, the court must follow the "ordinary remand rule," meaning that "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014). A remand for an award of benefits is inappropriate where the record has not been fully developed or there is a need to resolve conflicts, ambiguities, or other outstanding issues. *Id.* at 1101.

Here, the ALJ's error requires this matter to be remanded for further proceedings. As discussed above, the record in this action regarding Plaintiff's medical improvement of her bilateral carpal tunnel syndrome has not been adequately developed such that the ALJ could make a proper determination of medical improvement or the functional impact of any manipulative limitations, if any, on Plaintiff's ability to perform physical work-related activities. Accordingly, development of the record through further administrative proceedings is warranted.

On remand, the ALJ shall obtain the records from treating physician Dr. Kinzie. The ALJ may also, if warranted, obtain a consultative physical examination by a physician who has full access to all of Plaintiff's medical records, including those of Dr. Kinzie. The consultative examination shall focus on the functional limitations caused by Plaintiff's physical impairments, in particular, her hand and wrist impairments as of the cessation date. The ALJ is also free to develop the record in other ways, as needed.

Importantly, the Court expresses no opinion regarding how the evidence should ultimately be weighed, and any ambiguities or inconsistencies resolved, on remand. The Court also does not instruct the ALJ to credit any particular opinion or testimony. The ALJ may ultimately find Plaintiff is disabled as of the previously-found cessation date; may find Plaintiff's disability cessation date was later than previously determined; or may find that Plaintiff has medically improved as of the previously-found cessation date—provided that the ALJ's determination complies with applicable legal standards and is supported by substantial evidence in the record as a whole.

//

//

**B.     The Court Declines to Address Plaintiff's Credibility Determination.**

Plaintiff contends further that the ALJ erred in his credibility findings regarding Plaintiff's testimony. Because the Court will remand this action for further development of the record, it declines to address this argument at this time. One of two reasons the ALJ discounted Plaintiff's testimony was that she "did not seek treatment with anywhere near the frequency expected given the alleged severity of her symptoms/conditions."[6] (AR 21.) The ALJ's findings regarding credibility may change once records of Plaintiff's treatment for carpal tunnel syndrome have been obtained. On remand, the ALJ will have the opportunity to reassess the credibility of Plaintiff's testimony in light of the further-developed record.

## VI.     CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Elizabeth Nunez and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:     **October 17, 2017**                         /s/ *Sheila K. Oberto*
                                                                              UNITED STATES MAGISTRATE JUDGE

---

[6] The other reason given by the ALJ for discrediting Plaintiff, that she "did not demonstrate any particular discomfort during the hearing" (AR 21), cannot, standing alone, constitute a legitimate reason for discounting Plaintiff's testimony. *Perminter v. Heckler*, 765 F.2d 870, 872 (9th Cir. 1985). *See Saunders v. Astrue*, 433 Fed. App'x 531, 534 (9th Cir. 2011) (stating that personal observations of a claimant's function "cannot form the sole basis for discrediting his testimony").